## Case No. 15,946.

UNITED STATES v. ONE HUNDRED
BARRELS OF DISTILLED SPIRITS.
SAME v. FIFTY BARRELS OF DIS-
TILLED SPIRITS. SAME v. THIRTY
BARRELS OF DISTILLED SPIRITS.
SAME v. TWENTY BARRELS OF DIS-
TILLED SPIRITS.

[1 Lowell, 244; [1] 8 Int. Rev. Rec. 20.]

District Court, D. Massachusetts. June, 1868.

INTERNAL REVENUE—INFORMERS—WHO ARE—
OFFICERS.

1. Under section 179 of the act of 1864 [13
Stat. 305], as amended by that of July 13, 1866
(14 Stat. 145), officers of internal revenue may,
in many cases, be informers.

2. The informer, under that statute, is he who
first gives to some officer authorized to act up-
on it information which leads, in fact, to the
seizure and forfeiture.

[Cited in U. S. v. Card, Case No. 14,720a.]

3. An officer who obtains such information
through the examination of witnesses com-
pelled to testify before the grand jury, or one
who acts on information furnished him as an
officer, and intended by his informant to be
given the government, and does not discover
new facts by his own diligence, or who merely
makes certain what was suspected, is not the
informer.

[Disapproved in U. S. v. Chassell, Case No.
14,789. Cited in Four Cutting Machines,
Id. 4,987; U. S. v. Simons, 7 Fed. 714.]

[Cited in brief in Reif v. Paige, 55 Wis. 499,
13 N. W. 473.]

[4. Cited in Rice v. Thayer, 105 Mass. 261,
to the point that it is only when the amount
of the penalty has been recovered by judgment
of the court that an informer is entitled to a
moiety thereof.]

These four lots of whiskey, amounting in
all to two hundred barrels, were seized in
Boston and informed against under section
45 of the statute of July 13, 1866, c. 184 (14
Stat. 163), and, after default, were condemned
and sold. Against the proceeds of sale seven
persons filed petitions as informers.

It appeared, in evidence, that in August,
1867, three hundred barrels of whiskey were
taken from a warehouse (class A) attached to
Perry's distillery in Buffalo, upon bonds for
transportation to a certain warehouse in Bos-
ton. The bonds were not in evidence; but it
was said to be the course of business, that
goods so taken might be sent to any lawful
warehouse in the designated district, and that
thirty days were usually allowed for the
transportation, and that the bonds gave thir-
ty days' time for the transportation. When
such goods reach the warehouse, the collector
and certain other officers of the district
should examine the goods, and compare them
with the permits, and certify that they had
been received in warehouse, and their gauge,
&c., and when this certificate was produced
to the collector of the former district, and
payment had been made for any loss by
leakage or otherwise beyond what is allowed

by law, the transportation bonds would be
cancelled. In this case, certificates in due
form were produced to Mr. Root, the col-
lector at Buffalo; and Mr. Sprague, a deputy
collector there, examined them, and discover-
ed errors and discrepancies in carrying out
or adding some of the figures, and the col-
lector, at his request, sent them back to Gen-
eral McCartney, the collector here, for cor-
rection. Mr. McCartney at once discovered
that the certificates were forged, and so tele-
graphed to Mr. Root, who, in reply, asked
that the facts might be kept secret for a time,
until he could make further investigation.
Some days after, Mr. Root sent Mr. Hawley,
a special revenue agent, to Boston, with in-
structions to investigate the fraud. Mr. Haw-
ley found that General McCartney had gone
to Washington, but he consulted with the as-
sessor and with the district attorney, and
some other officers, and then went with Mr.
Sanderson, an inspector, to the station of the
Albany Railroad Company, where they exam-
ined books and made other inquiries, and dis-
covered that the whiskey had been brought
to Boston and delivered at a certain store-
house. Here they lost trace of it; but they
obtained the names of some of the team-
sters who had carried it either to or from the
storehouse. These facts and names they re-
ported to Mr. Hyde, assistant district attor-
ney, who summoned the teamsters before the
grand jury, then in session, and by his in-
quiries thus prosecuted—but how immediate-
ly or remotely his results depended on Haw-
ley's information did not at all appear—he
was led to suspect that some of the whiskey
had been carried to certain places in Boston.
Many searches were made, and many of the
conjectures proved to be unfounded; others
were more fortunate. Among other things,
Mr. Hyde told Mr. Horton, an inspector, that
some contraband whiskey would probably be
found in some warehouse in Lowell street;
and Mr. Horton proceeded to examine the
warehouses in that street, and in one of
them found one hundred barrels, part of the
goods which were seized and condemned.
There were no inspection marks whatever
upon these barrels; and whether or not they
were a part of the Perry whiskey was dis-
puted, and there was but little evidence upon
the subject. Mr. Hyde afterwards received
some information of a vague character, which
led him to suspect that some of the whiskey
would be found in the warehouse of a Mr.
Johnson, on or near Northampton street, if
Mr. Johnson had any such warehouse, which
was only suspected. He asked Mr. Hayes,
an inspector, to search; and Hayes found
such a warehouse, and the fifty barrels pro-
ceeded against in one of these suits. By
their marks they appeared to be a part of the
Perry whiskey. Again, Mr. Hyde traced, as
he thought, a part of the spirits to the shop
of certain persons on Worcester street, and
there lost the clew, and he told Mr. King,
who keeps a stable near that shop, that if he

[1] [Reported by Hon. John Lowell, LL. D.,
District Judge, and here reprinted by permis-
sion.]

would find the goods he would be entitled as informer; Mr. King succeeded in finding the twenty barrels. These had no inspection marks. The remaining thirty barrels were seized by Mr. Hayes, upon information given him by W. H. Swift that certain barrels were stored in a cellar, hired by the informant's brother, in Federal street, under suspicious circumstances. The marks upon these barrels warranted the inference that they were from Perry's distillery. Swift testified that he had no knowledge of the search for Perry's whiskey, or of any facts excepting those which he himself discovered. Mr. Sprague, the deputy collector in Buffalo, alleged himself to be the first informer in all the cases, because he discovered the clerical errors which led to the discovery of the forgery; General McCartney did the like, because he first discovered the forgery which rendered it certain or highly probable that some fraud had been committed; and Mr. Hawley, likewise, because he discovered some facts which enabled Mr. Hyde to discover others which led to the seizure of much of the whiskey; Mr. Horton claimed against the hundred barrels which he seized in Lowell street; Mr. Hayes against the fifty found by him in Johnson's warehouse; and Mr. King and Mr. Swift against the twenty and thirty barrels discovered by them respectively.

W. A. Field, Asst. U. S. Dist. Atty.
W. Curtis, for W. H. McCartney.
J. A. Loring, for N. P. Sprague.
F. A. Prescott, for L. Hawley.
T. M. Hayes, for J. K. Hayes and C. M. Horton.
L. S. Dabney, for G. M. King and W. H. Swift.

LOWELL, District Judge. The statute under which the petitioners proceed is section 179 of the statute of 1864, as amended by that of July 13, 1866 (14 Stat. 145, 146), which declares that all fines, penalties, and forfeitures which may be imposed or incurred (under the act), may be sued for, &c., and that a certain part shall be to the use of the person, to be ascertained by the court which shall have imposed or decreed any such fine, penalty, or forfeiture, who shall first inform of the cause, matter, or thing whereby such fine, penalty, or forfeiture shall have been incurred.

A good deal of stress was laid, in the argument, upon this language; and it was contended that no one was included in its terms who did not give information of the precise fraud, by the commission of which the goods became liable to forfeiture. My opinion is, that the meaning of this law is not substantially different from that of the customs act of 1799, § 91 (1 Stat. 697), which gives the share in one clause to the person in pursuance of whose information the forfeiture, &c., are recovered, and in another, to any officer of a revenue cutter in consequence of whose information they are recovered. "Fines, penalties, and disabilities are not incurred," says Mr. Justice Thompson, "and do not accrue in the technical sense of the terms until judgment. U. S. v. Morris, 10 Wheat. [23 U. S.] 299. In the ninth section of the act of 1866 (14 Stat. 101), the share of the fine therein referred to is for the person who shall give the information whereby it is imposed; and in still another section, the share is to go to the informer, if there be any, without further description. Under this statute, as under the other, and under the ordinary offers of reward for detection of a criminal or discovery of lost property, the first informer is he who first gives to a person authorized to receive it important information, which, in fact, leads to the desired result. And the offer is not necessarily confined to persons who shall expose the details of the fraud. Thus, if the government officers were already aware of the offence, but were unable to trace the goods, and the informer supplied the necessary facts; or if the informer, without knowing precisely what fraud had been perpetrated, knew of suspicious circumstances sufficient to justify a seizure, &c.; in these and similar cases, the person who gave the information by which the forfeiture was in fact decreed or imposed, would be within the fair intent of the act.

Accordingly, I have no hesitation in deciding that W. H. Swift is the first informer in respect to the thirty barrels found in his brother's warehouse in Federal street. It was in consequence of his information that they were seized and forfeited, and it does not appear that any facts of importance were furnished by any one else; and whether he was fully cognizant of the cause which rendered them liable to forfeiture or not, he was sufficiently so for all the practical purposes of the government. All the information it already had would have been useless without him, and his was sufficient, independently of what they possessed. It is not essential that an informer should act as prosecutor or be called as a witness; it is enough that the result is in fact reached primarily through his means. Sawyer v. Steele [Case No. 12,406]; Besse v. Dyer, 9 Allen, 151; Crawshaw v. Roxbury, 7 Gray, 374; Smith v. Moore, 1 C. B. 438.

Similar considerations govern the case of King. The officers had exhausted their clew, and had traced the whiskey as far as they could, and abandoned the search, and the assistant district attorney, who gave King some information, makes no claim. It is clear that one who does not choose to be an informer may enable another to become so, even as against his own subsequent demand. Fallick v. Barber, 1 Maule & S. 108. And it appears to me that Mr. King is entitled to the benefit of whatever knowledge he derived from Mr. Hyde, and is the informer in respect to the twenty barrels which he

discovered. I do not mean to say that Mr. Hyde could himself be the informer.

The cases of the several officers of the revenue service present more difficulty. If the point were new, it might perhaps be open to argument that an inspector or other officer owes his whole time to the government, and that there is no consideration for a promise to pay him a further reward for the zealous discharge of his duty. But the treasury department and the courts have acquiesced in the decision of Judge Ware, in Hooper v. 51 Casks of Brandy [Case No. 6,674], and it must be taken as settled that an officer of the revenue may, in some cases, be an informer. And the practice has been similar under the internal revenue laws, and rightly, as the statutes themselves show. Still it is clear that an officer cannot always be considered an informer merely because he as an officer acquires information useful to the government. If this knowledge is acquired in the ordinary discharge of his duty touching the very subject-matter, or under a special retainer to investigate that matter, I cannot hold him entitled to a gratuity.

I may take an illustration from the case of Mr. Hyde, whose information appears to have been of great use to the government, but who, in pursuance of a settled policy adopted in the district attorney's office, makes no claim as informer. His knowledge was obtained by the examination before the grand jury on oath of witnesses whom he compelled to attend; in other words, it was obtained by virtue of the great powers which the government confides to its prosecuting officers; but it is evident that the information obtained by the exercise of such a power must be for the use of the government in whose name and behalf it is demanded of the witnesses, and not for that of the prosecuting officer, the jury, or the witnesses themselves.

Similar considerations apply to all officers who are clothed with the duty of making an investigation on behalf of the government, whether with more or less ample powers. In my view the cases in which an officer may be an informer are, where he incidentally and not in the direct prosecution or course of his duty or of any special retainer for that purpose, makes a discovery; as if an inspector put on board a vessel merely to keep the cargo safely, discovers smuggled goods concealed; or where an officer sent to inquire into a particular charge discovers something entirely different and before unsuspected; or where he is told by some one, as a friend and not as an officer, of facts which his informant, not wishing to be known, refuses to bring forward himself, but tells him for the very purpose of enabling him to give information in his own name; in these cases an officer may be informer. I do not at present think of any others.

Mr. Hawley's case, which has given me more trouble than any other, must be governed by these considerations. In my judgment his retainer as a revenue agent, under pay, to investigate these frauds, makes his time the time of the government, and his information the information of the government, and he cannot justly lay claim to any share of this reward.

And so of General McCartney and Mr. Sprague. They merely in the course of their duty pointed out to the persons to whom they were bound to point them out, the mistake in figures and the forgery which they respectively discovered; they had no choice to give or withhold the information, and their action had no reference to any forfeiture. I doubt if the fact in either case was of sufficient importance to entitle them as informers; but if it were, its bearing on the forfeiture was only incidental; the act was a mere statement of a fact occurring in the course of their business, which they could not but state if they did their duty, and the mere stating of which cannot make them informers in the sense of the law.

Mr. Horton and Mr. Hayes were merely the seizing officers, and I have held before, and shall continue to hold until otherwise instructed by superior authority, that an officer who has merely followed instructions and made a seizure which he was asked to make, although he may have exercised great skill and ingenuity, is not an informer. A recent customs act gives the seizing officer a share of forfeitures in cases where there is no informer, and I dare say this law may be wise and expedient so long as the policy of paying informers is adhered to, but it only confirms the view that a seizing officer, as such, is not an informer. It is strongly urged that the barrels seized by Mr. Horton are not proved to be a part of the Perry whiskey, and that if they are not he is the sole discoverer, because Mr. Hyde sent him to find only Perry's whiskey. But in such a case the burden is very strongly upon the officer to show that they are different. He was asked to look in Lowell street for contraband whiskey, without any particular description of it; he looked there and found some, and there is very little evidence either way concerning the article found. The presumption is almost irresistible that it is the same whiskey he was looking for. The argument that this whiskey, if Perry's, ought to have been condemned under a different section of the statute, proves too much; for eighty of the barrels were Perry's, and were condemned under this section. That argument might have availed a claimant; but as it is admitted that Perry's whiskey was liable to forfeiture under another clause, and as there was no defence, it may well be that the court did not inquire as carefully as it otherwise might have done, whether the evidence pointed more strongly to one or another violation of the act. I do not mean to say, however, that there was not sufficient

prima facie evidence to entitle the government, in a defaulted action, to a condemnation under section 45.

Upon the whole, I grant the petitions of King and Swift. and deny the others. Ordered accordingly.